## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>IRISH BANK RESOLUTION CORPORATION LIMITED (IN SPECIAL LIQUIDATION),<br><br>    Debtor In A Foreign Proceeding, | Chapter 15<br><br>Case No.:  13-12159 (CSS) |
| PADDY MCKILLEN, ANTHONY LEONARD, AND CLARENDON PROPERTIES LIMITED,<br><br>    Plaintiffs,<br><br>        v.<br><br>KIERAN WALLACE AND EAMONN RICHARDSON, foreign representatives for Debtor,<br><br>    Defendants. | Adversary Proceeding<br><br>Case No.: |

## ADVERSARY COMPLAINT

1.      Paddy McKillen ("McKillen") is a citizen of the Republic of Ireland and the United Kingdom residing at Apt. 10, 55 Percy Place, Dublin 4, Ireland, with additional residences in the United Kingdom, France, and the United States.  He is a founder of and remains a principal in Clarendon Properties Limited.

2.      Anthony Leonard ("Leonard") is a citizen of the Republic of Ireland, residing at 6 Suffolk Street, Dublin 2, Ireland.  He is a founder of and remains a principal in Clarendon Properties Limited.

3.      Clarendon Properties Limited ("Clarendon") is a privately-owned international investment company, jointly owned by McKillen and Leonard, with extensive property investment, management, and development interests in Europe and the United States (Clarendon, together with McKillen and Leonard, hereafter, jointly, the "Plaintiffs").

4.      Kieran Wallace and Eamonn Richardson (the "Foreign Representatives") are special liquidators and foreign representatives of Irish Bank Resolution Corporation Limited ("IBRC"), having filed a Chapter 15 petition in the United States Bankruptcy Court in Delaware seeking recognition of IBRC's pending insolvency in Ireland as a "foreign main proceeding" in August of 2013, which recognition was granted by the Bankruptcy Court on December 18, 2013.

5.      Although the Plaintiffs do not believe that either relief from the automatic stay or any other leave of the Court is necessary for the filing of this Complaint, in an abundance of caution, contemporaneously with the filing of this Complaint, they have filed a motion for entry of an order (i) deeming that neither the automatic stay nor the rule set forth in *Barton v. Barbour*, 104 U.S. 126 (1881) apply to the filing of this Complaint or, alternatively, (ii) for relief from the automatic stay to file this Complaint, as well as leave to sue the Foreign Representatives.

## PRELIMINARY STATEMENT

6.      This action seeks redress by individuals and their privately owned company who have been and are being harmed in the United States directly as a result of misconduct engaged in overseas by operators of an insolvency estate under the protections of this Court, namely the Foreign Representatives.

7.      The Foreign Representatives, albeit purportedly acting under color of foreign law and procedure, are flouting the duties imposed on them when they sought and obtained the privileges and protections of the United States Bankruptcy Code.

8.      Specifically, the Foreign Representatives sought and obtained recognition of IBRC's Irish liquidation under Chapter 15 of the Bankruptcy Code, and also secured the Court's recognition of themselves as Foreign Representatives under the same Code chapter.

9.      As Foreign Representatives, the Defendants are compelled to observe certain standards of care and codes of conduct in their dealings with creditors and persons in interest in the liquidation estate.

10.      Indeed, because of the legal position taken by the Foreign Representatives in pursuing a loan against McKillen, and because McKillen owned Anglo stock un-associated with the Maple 10 transaction, the Foreign Representatives  cannot dispute that, for the purposes of the matter *sub judice*, McKillen must be treated as both a creditor and person of interest in the matter *sub judice*.

11.      In that regard, the Defendant Foreign Representatives have violated the statutory and common law duties of care they owe to McKillen, and the manner in which they have done so (and continue to do so) has harmed and continues to harm McKillen, Leonard, and Clarendon in their business in the United States, thereby entitling them to the entry of a damages judgment.

12.      Additionally, Plaintiffs demand that the *sub judice* Recognition Order be modified because of the conduct of the Foreign Representatives -- attempting to perpetuate and enforce an illegal obligation -- such that their recognition as foreign representatives be terminated as manifestly contrary to United States public policy, and cannot be sanctioned, tolerated, or allowed by this Court to continue.

## PROCEDURAL HISTORY

13.    On or about August 26, 2013, the Foreign Representatives filed a petition seeking recognition of IBRC's insolvency-related proceeding in Ireland as a "foreign main proceeding" under sections 1515 and 1517 of the Bankruptcy Code, Chapter 15 of Title 11 of the United States Code.

14.    On or about December 18, 2013, the Bankruptcy Court entered an order granting recognition of the foreign proceeding as a foreign main proceeding under the Bankruptcy Code, thereby conferring the protection of a Bankruptcy stay upon IBRC.  The Court also recognized Messrs. Wallace and Richardson as Foreign Representatives of IBRC.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this application pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are §§ 1520(a)(1) and 362(d)(1) of the Bankruptcy Code, Rule 4001(a) of the Federal Rules of Bankruptcy Procedure, and Rule 4001-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

## FACTUAL BACKGROUND

### McKillen, Leonard, Clarendon, and Anglo Irish Bank

16.    In or about January of 2009, based in part on some of the events and circumstances referenced herein, the Irish government was forced to nationalize Anglo Irish Bank PLC ("Anglo").

17.     Subsequently, by statute, the Irish government created IBRC as a successor to Anglo (and another institution – the Irish Nationwide Building Society), and both those institutions were merged into IBRC.

18.     In or about February of 2013, the Irish Minister for Finance issued a Special Liquidation Order appointing the Wallace and Richardson as Special Liquidators for IBRC.

19.     In December of 2013, as referenced above, the IBRC liquidation was afforded recognition as a foreign main proceeding under sections 1515 and 1517 of the Bankruptcy Code, and Wallace and Richardson were recognized as the Foreign Representatives of the debtor.

20.     Prior to 2008, McKillen was among the largest and highest rated borrowers from Anglo, then a prominent commercial banking institution based in Ireland and having extensive interests and loan exposure throughout Europe and the United States and, because of their avowed legal position in seeking to recover debt against McKillen (which legal position is contested), and because he owned shares in Anglo unassociated with the events herein, the Foreign Representatives must treat McKillen as having been, at times relevant to these claims, a shareholder in Anglo Irish Bank, in addition to being a party in interest in the underlying insolvency proceeding to whom heightened duties of care are and were owed.

21.     McKillen, Leonard, and their company, Clarendon Properties, were customers of and borrowers from Anglo for many years, having borrowed large sums from Anglo to help fund the growth of their extensive property portfolio.

22.     Among the business interests McKillen, Leonard, and Clarendon had with Anglo were various real estate developments and property holdings around the world, including commercial and private real estate holdings in the United States, primarily in Massachusetts and California.

23.     In or about 2008, McKillen and companies associated with him were indebted to Anglo in the approximate amount of €2,000,000,000, for a portfolio of interests including privately held real estate in California and his 50% partnership interest in Clarendon Properties, which held a property portfolio valued in excess of $350,000,000 in the United States.

24.     Leonard was and is McKillen's co—principal in Clarendon Properties, and was also an Anglo borrower.

25.     In or about 2008, Clarendon Properties was a direct borrower and customer of Anglo, having funded in part its property portfolio in the United States with approximately $250,000,000 worth of loans from Anglo, for which loans McKillen and Leonard acted as guarantors.

26.     McKillen's long-term principal contact and customer representative/account manager at Anglo was Tony Campbell, with whom he had transacted business since the early 1990's and who, by 2008, was head of Anglo's operations in the United States, running the business from Anglo's U.S. headquarters in Boston, Massachusetts.

27.     At all relevant times, Campbell was the primary bank representative interacting with McKillen; and he frequently presented McKillen with opportunities to invest in U.S. deals, always with the promise and expectation of Anglo's full backing and support.

28.     Notably, in or about 2008, Anglo's U.S. headquarters was located in a Clarendon-owned property, 265 Franklin Street, Boston, and Anglo was an important tenant of Clarendon's.

**Sean Quinn**

29.     On information and belief, in or before 2008, Anglo learned that, through the acquisition of a series of contracts for difference, one of its largest borrowers, Sean Quinn and

his family, had accumulated an ownership stake in approximately 29% of Anglo's outstanding issued stock.

30.      In or about March and April of 2008, several events and crises occurred affecting the global economy in general and the banking industry in particular, compounded for Anglo by reportage and rumors regarding its ever-deepening relationship with Sean Quinn, leading to a steep decline in the trading value of Anglo stock.

31.      In light of its exposure as a lender to Quinn and his family-related entities (in the estimated amount of well in excess of two billion Euros), Anglo came under pressure from the Irish Central Bank and Financial Regulator to stem the steady drain on its resources necessitated by maintaining the relationship with the Quinn family as both its largest debtor and its largest shareholder.

32.      In order to counteract the perceived existential threat to its operations that the Quinn family shareholding represented, among other concerns, Anglo determined that it must facilitate the orderly unwinding or "de-risking" of the Quinn family holdings in its stock.

33.      In the succeeding months, Anglo determined that it must secure a buyer or buyers for a substantial portion of the shares held by the Quinn family (referred to within Anglo as the "Maple" holding).

34.      Anglo approached several institutional investors to ask that they acquire some of the Quinn family shares, but to no avail.

**The Maple 10**

35.      In July of 2008, in order to ensure an orderly wind-down of the Quinn family holdings, Anglo determined that it should approach its largest (non-Quinn) borrowers and ask

that they each agree to fund the purchase of approximately 1% of the total outstanding Anglo shares (*i.e.*, a portion of the Quinn family shares) so as to diversify share ownership.

36.     Anglo determined that it would fund such off-take of the Quinn family shares by trusted borrowers through granting further loans to those borrowers on commercial terms.

37.     On information and belief, none of these existing large trusted borrowers -- who would later come to be known as the "Maple 10" -- knew who the other participants were.

38.     In or about early July of 2008, while in London, Paddy McKillen -- a large and highly-rated borrower selected by Anglo -- received a telephone call from Tony Campbell (McKillen's long-standing and trusted customer account representative) on behalf of Anglo's CEO.

39.     At the time, Tony Campbell was head of Anglo's operations in the United States, managing the bank's U.S. headquarters in Boston -- where Anglo was one of McKillen's/Leonard's/Clarendon's largest tenants and largest creditor.

40.     Campbell told McKillen that Anglo needed to place a substantial tranche of Quinn Family shares quickly to de-risk the bank's exposure to Quinn, and that Anglo management was asking a number of its most trusted and valued customers to assist it in resolving the difficult situation in which the bank found itself.

41.     McKillen was told that, if he participated in the transaction, Anglo's plan would be to hold the shares in escrow for a short period of time so that they could be sold either piecemeal or to an institutional investor in the interest of Anglo.

42.     McKillen was not told and did not know the identity of the other large customers who were also being asked by Anglo to help.  McKillen was assured the transaction was lawful

and that Anglo would fund the entire consideration and that the extent of his exposure was 25% of the sum he was to borrow.

43.     Acutely aware that he was beholden to the bank, and that he and Clarendon had substantial loans coming due, McKillen felt enormously pressured to acquiesce to the request and to enter into the transaction that Anglo management proposed.  In the course of his decision-making, McKillen was told that the Bank needed him to enter into the transaction and he was led to believe that a refusal to do so would be looked upon unfavorably by the Bank.

44.     McKillen returned to Dublin within 48 hours to finalize the transaction.

45.     Because time was of the essence, while in Dublin, McKillen had little more than a day or so to consider the proposal, decide whether to participate, and execute the documentation presented by Anglo and its representatives.

46.     McKillen did not seek independent legal or financial advice but, instead, relied on Anglo's advisors and their representations, having great respect for such advisors and knowing them to be very respectable and reputable professionals and entities.  McKillen was informed by the bank's representatives and agents, when he met them at the bank in Dublin, that the transaction was legal and above board; and that it had been cleared with the Financial Regulator, by "Merrion Street," which McKillen understood to mean the Minister for Finance and the Department of Finance (where both are situate), as well as the legal advisors and corporate finance advisors to the bank.

47.     McKillen was not advised of the bank's plan to warehouse the shares over the long term. Indeed, when Anglo stock later rose in value McKillen became alarmed that Anglo failed or refused to take the opportunity to sell the shares for the increase in value, which increase would have satisfied McKillen's obligations under the then extant loan agreement that

financed their purchase. This was despite requests on the part of McKillen that the bank sell the shares but the bank resisted and delayed for its own reasons.

48.     Nonetheless, McKillen felt he was "over a barrel" and, although no explicit threat had been made, he felt he had to participate to assist Anglo and to stay in its good graces, especially since existing loans (both his own and Clarendon's) would soon be due for repayment or renewal.

49.     McKillen reasonably believed that Anglo and its representatives had given him all the assurances necessary and appropriate to enable him to enter into the proposed transaction and limited recourse loan arrangement.

50.     McKillen was unaware of any illegality associated with the transaction, but instead was advised by Anglo and its representatives that the transaction was entirely legitimate.

51.     McKillen believed Anglo's representations and advice, and reluctantly agreed to participate in the transaction, but made it clear that he did so without any intention of making a profit on the deal.

52.     Thereafter, Anglo drew down sufficient monies from the McKillen loan to fund the acquisition of approximately one percent of Anglo's outstanding shares (10,200,000 ordinary shares), and McKillen thereby became a member of what would later become known as the "Maple 10" -- namely, ten large Anglo borrowers who each facilitated the purchase of one percent of outstanding Anglo shares to reduce the Quinn family holding in the bank.

53.     Anglo would advance all funds used by McKillen to fund the purchase of the shares through a term loan with limited recourse (it later emerged that Anglo had a similar arrangement with the other members of the Maple 10), and a subsequent superseding zero

recourse, loan.  The funds advanced by Anglo to McKillen remained in an Anglo designated account at the bank and were never in the unfettered control of McKillen.

**The Facility Letters**

54.     At Anglo's request and for its exclusive benefit, in July of 2008, McKillen and the bank entered into a loan agreement under which Anglo would advance all funds for McKillen to pay for Quinn family shares.

55.     Anglo drew up a loan agreement pursuant to which McKillen could borrow up to €60,000,000 to fund the acquisition of approximately 1% of the outstanding bank shares.

56.     McKillen signed the loan agreement (the "First Facility Letter"), which was dated July 10, 2008.

57.     Paragraph 3.2 of the First Facility Letter provided that the maximum recourse available from McKillen was limited "to 25% of the balance outstanding under the Loan[,]" ("the Loan"), which re ourse was subsequently changed to zero.

58.     The loan was to be repayable either on demand or by January 31, 2009.

59.     Ultimately, €45,101,799 was drawn down against McKillen's name to fund the acquisition, on the understanding that the shares be held in escrow by or on behalf of Anglo.

60.     It was McKillen's expectation that Anglo would take all necessary steps as soon as possible to sell the shares and repay the loan.

61.     Some months later, when McKillen and his team enquired as to the status of Anglo's success in selling the shares, the response was that the shares were still being held, but that they would be sold to the market -- piecemeal -- over time, with the proceeds being applied to his account.  McKillen pleaded with the bank and tried to apply pressure on them to sell the shares, but the bank failed or refused to do so for their own reasons.

62.    In October of 2008, in response to McKillen's queries about selling the shares, which had by then risen in value, and his alarm that the shares had not been sold, Anglo advised him that new loan terms had been issued to him, removing the 25% recourse clause; hence, he need not be concerned that the shares had not been or were not being sold then.

63.    As such, in partial consideration for McKillen's continued involvement in funding the transaction (he was demanding the shares be sold to cover his obligation), Anglo had drawn up a new loan agreement that (in bold print) expressly superseded the First Facility Letter.

64.    This new loan agreement, which Anglo appears to have back-dated (although McKillen was not aware of that at the time) to July 17, 2008 (the "Second Facility Letter"), differed greatly from the First Facility Letter with respect to McKillen's personal recourse: paragraph 3.2 provided that the recourse would "be limited to 25% of the balance outstanding under the Facility *or to the value of the shares at expiry of the facility.*" (emphasis added).

65.    McKillen read and executed the Second Facility Letter, thereby reducing his exposure to the lesser of (a) 25% of the borrowed principal plus interest, or (b) the actual value of the shares at the expiration of the loan (the Second Facility Letter was repayable either on demand or by September 30, 2009).

66.    A third Facility Letter, purporting to reinstate the original 25% recourse provision (and extending the repayment period to December 31, 2009), was issued in January of 2009; but, despite tremendous pressure from Anglo, McKillen neither accepted its terms nor signed it ("Third Facility Letter").

**<u>Value of Shares Reduced to Zero</u>**

67.    In or about early 2009, when the Irish government passed legislation mandatorily transferring all Anglo shares to the Irish Minister for Finance and re-registered the bank as a

private limited company (effectively nationalizing it), the stock price plummeted and trading in Anglo shares was suspended.

68.     The trading value of the stock funded by McKillen was effectively extinguished, as was the stock in Anglo that McKillen held from other share purchases unconnected with the Maple 10 transaction (although, on information and belief, a promise was made by Government officials and in the relevant legislation that an independent valuation would be assessed for the shares and appropriate recompense would be made to the shareholders whose shares had been acquired by the Minister – compensation which McKillen has never received).

69.     As a result, pursuant to the terms of the Second Facility Letter, McKillen's maximum exposure to Anglo for the funds lent to pay for the Quinn family shares (*i.e.*, the value of the shares) was zero.

70.     As such, McKillen believed that the debt associated with his participation in the Maple 10 transaction was extinguished, and he heard nothing to the contrary from Anglo or its representatives, either in early 2009 or in September of that year, when the loan facility expired. In their current action against McKillen to collect the alleged debt associated with the Maple 10 transaction, the Foreign Representatives state that McKillen "agreed to purchase" and "acquired the Shares and discharged the consideration payable for the Shares using the funds advanced under the Loan."  As such, albeit a matter of dispute in that action, the Foreign Representatives cannot be heard here to contend -- for the purposes of ascertaining the duties owed to different liquidation estate constituencies -- that McKillen was not a shareholder or was not entitled to the same estate treatment as other shareholders, and they cannot contend that he was not entitled to the same duties of care owed to former shareholders.  Indeed, McKillen was a shareholder in

Anglo before the Maple 10 transaction and continued to hold distinct Anglo shares in his own right up until the bank was nationalized.

71.     As of this filing, no official or independent assessment has been undertaken as to the value of the Anglo shares on the date of the bank was nationalized, presumably because of the ongoing liquidation of IBRC (the entity, *sub judice*, into which Anglo Irish Bank was subsumed).

72.     Currently, it appears possible that the IBRC liquidation may result in some degree of liquidity within the estate, thereby creating the real possibility that McKillen, alongside other former Anglo shareholders, might get some distribution related to an assessed value of the shares at the time they were taken by the Minister for Finance.

73.     Therefore, in addition to being a party in interest under the Bankruptcy Code, because he is deemed by the Foreign Representatives to have been a shareholder whose shares were taken by the Minister for Finance and therefore, should be entitled to some value for those shares, McKillen must be treated by the Foreign Representatives as one who stands in the shoes of an unsecured creditor and/or potential beneficiary of the estate in liquidation, although neither McKillen nor any of the other Plaintiffs seek relief against the IBRC estate in this litigation or by this Complaint.

74.     Consequently, and by dint of their voluntary invocation of the benefits and protections of this Court and the United States Bankruptcy Code, the Foreign Representatives are fiduciaries of the estate in liquidation and owe McKillen absolute duties of loyalty, candor, disclosure, due care, impartiality, good faith and fair dealing.

### The Maple 10 Transaction Becomes The Subject Of Public Outcry

75.     In mid-February of 2009, the Irish Taoiseach (Prime Minister) informed parliament that a group of ten wealthy businessmen had come together to purchase ten percent of Anglo shares in 2008, and that that transaction was being investigated by the Irish authorities.

76.     Later that month, it was reported that Anglo had funded the acquisition of ten percent of its own stock in 2008 by the ten businessmen referred to by the Taoiseach.

77.     A media frenzy ensued, with reporters and others clamoring to find out the identities of the "golden circle" of businessmen involved – the group that later became known as the "Maple 10."

78.     Over time, the identities of the Maple 10 participants were made known, with McKillen being the last to be publicly identified.

79.     For the months and years to follow, the public outcry and media discourse regarding the fate of Anglo was both enormous and wholly negative; and the pervasive view became that the Bank's conduct would have a cataclysmic impact on Irish society and its economy for generations to come, with much of the public and market vitriol being directed at the Maple 10.

80.     For the months and years to follow, the Maple 10 participants were the subject of widespread condemnation by Irish and international commentators and media; they were the target of attacks and opprobrium in the commercial real estate, property development, and commercial/investment banking communities; and they were maligned in the Irish Parliament, with the leader of one national political party demanding that they be locked up.

**The Maple 10 Loans were Illegal When Made by the Bank**

81.     At least one Court has concluded that the agreement by Anglo to lend money to the Maple 10 to acquire the Quinn Family shares was an "improper and unlawful" transaction because, under relevant laws and regulations, a company is not permitted to lend money to anyone to purchase shares in the company, especially in the circumstances in which Anglo found itself in or about 2008.

82.     Albeit several years later, two former executives of Anglo, Patrick Whelan and William McAteer, were convicted in a Dublin court of illegally lending to the Maple 10 to fund the purchase of the Quinn family shares, in an effort to prop up the Anglo share price.

83.     As recently as this past month, David Drumm, the former chief executive officer of Anglo Irish Bank, pled guilty to ten criminal charges of authorizing the giving of illegal loans to the Maple 10 to purchase shares in Anglo (he is already serving a six year sentence for illegally inflating the share value through fraud and false accounting).

**McKillen, Leonard, and Clarendon Bear The Brunt Of The Maple 10 Outcry**

84.     In the months that followed his identification as a Maple 10 participant, McKillen was castigated, maligned, insulted, and even shunned in the business community for his role in the transaction, and he suffered greatly as a result of his participation in the arrangement.

85.     Specifically, in terms of the impact on McKillen, the direct result of his public association with the Maple 10 was a barrage of negative publicity and a whispering campaign in which he was identified with and perceived to be associated with the bad actors within Anglo (some of whom have since been convicted and are imprisoned for their criminality).

86.     As a direct result of this association, in conjunction with other market and economic realities of the time, McKillen was damaged in his reputation and in his investments in

the United States; he was deprived of and excluded from business opportunities that he would otherwise have had here; he was refused participation in property developments and credit applications in the United States were made more difficult; and other avenues of opportunity here were closed off to him.

87.     Equally, in terms of the direct impact on Leonard, because of his association with McKillen as a principal in Clarendon, the result of McKillen being identified as one of the Maple 10 and associated with bad actors within Anglo was that he too was damaged in his reputation and in his investments in the United States; he was deprived of and excluded from business opportunities that he would otherwise have had; he was refused participation in property developments and credit applications in the United States were made more difficult; and other avenues of opportunity were made more difficult.

88.     In terms of the direct impact on Clarendon, the result of McKillen being identified as one of the Maple 10 and associated with bad actors within Anglo was that Clarendon was reputationally damaged and its investments in the United States were negatively impacted; it was deprived of and excluded from business opportunities that it would otherwise have had; it was refused participation in property developments and credit applications in the United States were made more difficult; and other avenues of opportunity were closed off to it.

89.     Over time, the media frenzy and market negativity revolving around McKillen's involvement in the Maple 10 dissipated; things began to return to normal for him, Leonard, and Clarendon in their United States operations and interests; and the negative impact of the association began to dissipate.

**In March of 2014, McKillen Resolved His Entire Indebtedness to Anglo**

90.     In the years after the collapse of Anglo and after the liquidation of IBRC, large portions of the bank's loan portfolio were transferred to an entity created by the Irish government called the National Asset Management Agency ("NAMA").   Nama was established to manage and recover value from the major toxic and non-performing loans in the Irish banking system. There was a series of disputes between McKillen and NAMA as to whether NAMA had authority to take or mandate a transfer of McKillen's Anglo debts from the IBRC liquidation estate.   McKillen objected to this attempted transfer to NAMA, as his loans were fully performing and up to date, and he maintained valuable equity across his portfolio despite the international property and banking collapse at the time.   These disputes led to several lawsuits in both Ireland and the United Kingdom, at least one of which is ongoing.   Through the course of those disputes, an enormous degree of animosity and 'bad blood' developed between McKillen on the one hand and NAMA, the Special Liquidators (*i.e.*, the Foreign Representatives *sub judice*), and officials of the Irish Ministry of Finance on the other.

91.     In February of 2011, the Irish Supreme Court decided in McKillen's favor regarding NAMA's attempts to take over his indebtedness to Anglo Irish Bank/IBRC and other Irish banking institutions and, subsequently, for a number of months leading up to early 2014, McKillen negotiated with the Foreign Representatives in an effort to resolve all his outstanding indebtedness to IBRC (in its capacity as Anglo's successor in interest).

92.     At the time of at least some of these negotiations, the Foreign Representatives had already obtained this Court's recognition of the IBRC liquidation as a Foreign Proceeding and had been appointed Foreign Representatives in the Chapter 15 action.

93.    As such, having sought and secured the privileges and protections of this Court, the Foreign Representatives subjected themselves to the strictures of the Bankruptcy Code and the federal common law fiduciary duties of disinterestedness, honesty, disclosure, good faith and fair dealing in their dealings with creditors, and to impartially and honestly deal with and make disclosure to parties in interest.

94.    In the course of their negotiations, McKillen understood that he and the Foreign Representatives reviewed and identified all of McKillen's outstanding indebtedness to Anglo.

95.    In or about April of 2014, McKillen entered into a comprehensive agreement with IBRC (as successor to Anglo) and the Foreign Representatives to resolve all of his outstanding indebtedness to the bank (entitled a "Loan Sale Deed").

96.    There can be no doubt that, during the course of their negotiations with McKillen, the Foreign Representatives were fully aware of McKillen's involvement in the Maple 10 transaction and that Anglo had lent the money used by McKillen to fund the purchase Quinn family shares in 2008; nor can there be any doubt that the Foreign Representatives knew, should have known, and had an affirmative duty to know the circumstances of that loan agreement, its genesis, its documentation, and its impropriety; in addition to the impact the nationalization and ultimate dissolution of Anglo had on McKillen's obligations under the relevant facility letters.

97.    At no point, and in none of the schedules furnished by the Foreign Representatives to McKillen detailing his outstanding indebtedness, was any reference whatsoever made to any indebtedness associated with the Maple 10 transaction or to the First, Second, or Third Facility Letters.

98.    In fact, without exception, all participants in the negotiations on behalf of the Foreign Representatives repeatedly confirmed the *totality* of McKillen indebtedness to

Anglo/IBRC, and no reference was made at any time to any actual, alleged, or potential indebtedness related to the Maple 10 transaction; nor was the alleged Maple 10 debt specifically excluded from or carved out of the Loan Sale Deed.

99.    As such, by the time the parties entered into and effectuated the terms of the April 24, 2014 Loan Sale Deed, McKillen reasonably believed that all of his debt to IBRC (and Anglo) was extinguished.

**Foreign Representatives Filed Suit To Recover An Illegal Obligation**

100.    At no time during the negotiation of the Loan Sale Agreement did the Foreign Representatives give McKillen or his representatives any indication that they intended to assert that his Maple 10 debt remained outstanding.

101.    As McKillen later learned, only in July of 2014, months after the final resolution of all McKillen's debts to IBRC and while they were benefiting from the privileges and protections of the Bankruptcy Code stay, did the Foreign Representatives give the first indication that they intended to pursue McKillen for debt related to his Maple 10 loan.

102.    As McKillen later learned, the Foreign Representatives filed, but did not serve, an action in the Irish High Court against McKillen on July 16, 2014.  It was not until those proceedings were served on McKillen in July 2015 that he first learned that they related to the Maple 10 loan and that the Foreign Representatives were demanding repayment of 25% of his Maple 10 loan (as contemplated in the First Facility Letter), in addition to interest and costs associated therewith.

103.    On July 14, 2015, the Foreign Representatives obtained an Order to Renew the Summons in the Irish High Court, and the Summons was first served on McKillen thereafter.  Up until that date of service of the Summons on Mc Killen, the Foreign Representatives had not

disclosed the contents or subject matter of the Summons to him.  The fact that the Summons related to an effort to collect the Maple 10 loan only became known to Mc Killen when the Summons was served on him.

104.    The Foreign Representatives initiated suit in Ireland on the illegal, superseded, and defunct First Facility Letter after having formally invoked the protections of the Delaware Bankruptcy Court, securing the bankruptcy stay as a shield against lawsuits in the United States by creditors, interested persons, and/or injured third parties.

105.    As such, while they were "Foreign Representatives" in this proceeding and after they had subjected themselves to the jurisdiction of the Court and the strictures of the Bankruptcy Code and the federal common law, the Foreign Representatives failed to deal honestly in their negotiations with McKillen to resolve all his indebtedness and obligations to IBRC (as Anglo's successor).

106.    When they invoked the privileges and protections of the Bankruptcy Court in seeking appointment as foreign representatives under Chapter 15 of the Code, the Foreign Representatives subjected themselves to the jurisdiction of the Court and to the same strictures of equitable and just conduct imposed on trustees and liquidators, or any other judicial appointee entrusted with managing an estate in Bankruptcy, and were required to deal with all parties in interest honestly, fairly, and in good faith.

107.    In their capacity as foreign representatives recognized by the Bankruptcy Court, the Foreign Representatives also owed fiduciary duties to creditors of the estate, and McKillen should be entitled to expect full and complete candor from them in all their dealings with him as trustees of the insolvency estate of which he ought to be treated as an unsecured creditor if the

Foreign Representatives view him to be a former shareholder, which they do.  In any event, and unrelatedly, McKillen was a shareholder in Anglo at the time it was nationalized.

108.    In their capacity as foreign representatives recognized by the Bankruptcy Court, the Foreign Representatives had an obligation to comply with 11 U.S. Code § 704, and to exercise the duties of a trustee in bankruptcy, among which is the duty to "furnish such information concerning the estate and the estate's administration as is requested by a party in interest."  11 U.S. Code § 704(a)(7).

109.    Because McKillen was a party in interest in all his negotiations with the Foreign Representatives, he was entitled to expect that all his obligations to IBRC would be disclosed so that all his obligations could be resolved (as he reasonably believed they were in April of 2014).

110.    McKillen, Leonard, and Clarendon did not object to the Chapter 15 petition, or the appointment of the Foreign Representatives in late 2013.

111.    However, in light of the Foreign Representatives' actions since the filing of the Chapter 15 petition, it is now clear to McKillen, Leonard, and Clarendon that they have each been directly impacted by, and suffered injuries as a result of, the improper and inequitable acts by the Foreign Representatives.

112.    Specifically, by instituting a collection proceeding against McKillen for recovery of alleged indebtedness relating to the Maple 10 transaction, the Foreign Representatives have -- (on information and belief) purposely, maliciously, and with strategic intent -- again focused public and media attention on McKillen's role in that notorious transaction, thereby re-igniting the vitriol, opprobrium, and negative commercial impact initially directed against McKillen, Leonard, and Clarendon when McKillen's involvement in the Maple 10 first became public, but which had died down or disappeared over the intervening years.

113.    By way of illustration of the negative impact of public comment and stirring up of opprobrium associated with the Maple 10 transaction has had or can have on them and their business in the United States, McKillen, Leonard, and Clarendon can show specific instances of having lost business opportunities and having been denied credit by financial institutions as a result of McKillen's association with the Maple 10 transaction and Anglo.

114.    For instance, in the period between late 2014 and early 2015, McKillen, Leonard, and Clarendon approached New York Life seeking to refinance the property at 265 Franklin Street, Boston.

115.    New York Life refused to proceed, making clear that it was doing so, *inter alia*, because of the negative press coverage and controversy over McKillen's involvement in the Maple 10 transaction.

116.    The Foreign Representatives knew or should have known that instances such as this would be among the likely consequences of re-igniting McKillen's Maple 10 involvement when they filed an action to collect the illegal and superseded indebtedness related to the Maple transaction.

117.    Moreover, the Foreign Representatives know that any time McKillen, Leonard, and Clarendon seek credit or financing for projects, the question is invariably asked in due diligence as to extant or pending civil or criminal proceedings against any of them, and that they are obliged to refer to the Maple 10 debt collection action being pursued by the Foreign Representatives.

118.    This fact has had a chilling effect on McKillen's, Leonard's, and Clarendon's access to capital markets in the United States and, as a consequence, for instance, they incurred

higher costs of funding with alternative funders for the re-financing of the property at 265 Franklin Street in Boston following the withdrawal of New York Life.

119.    Discovery will help establish the full extent of similar and/or related harm that the actions of the Foreign Representatives have directly caused to Plaintiffs, many of which may be concealed from Plaintiffs simply by dint of the wall of silence they faced and face by virtue of the association with the Maple 10.

**The Foreign Representative's Abuse of their Positions and the *Ultra Vires* Nature of their Acts**

120.    The Maple 10 transaction was conceived, initiated, conducted, coordinated, and effectuated by the predecessor in interest to IBRC and the Foreign Representatives, Anglo.

121.    IBRC stands in the shoes of Anglo, as do the Foreign Representatives in their conduct of the Chapter 15 proceeding and related proceedings in Ireland.

122.    Despite their knowledge that the Maple 10 transaction was illegal and improper (and that it has been adjudicated as such), and their knowledge that pursuit of the superseded First Facility Letter indebtedness is equally improper, the Foreign Representatives continue to press their collection action against McKillen on the First Facility Letter, while at the same time continuing to enjoy the privileges and protections of the Bankruptcy Court.

123.    The Foreign Representatives are abusing the privileges and protections of the Bankruptcy Court, and the shield afforded the estate by the bankruptcy stay, while they purposefully injure and visit harm upon Plaintiffs in the United States.

124.    Specifically, on the pretense that they are attempting to enforce a loan (which loan represents an illegal obligation that was expressly superseded by the Second Facility Letter, and that was entirely extinguished by subsequent events), the Foreign Representatives are

intentionally, maliciously, and unconscionably visiting commercial, economic, and reputational harm and injury upon Plaintiffs in the United States.

125.    These acts by the Foreign Representatives are *ultra vires*.

126.    Contemporaneously herewith, McKillen, Leonard, and Clarendon, as injured parties, request relief from the Bankruptcy Stay (to the extent such relief is required) in order to pursue their rights in the United States against the Foreign Representatives for injuries and damages caused to them and their interests in the United States.

127.    The Foreign Representatives continue to pursue improper, illegal, and superseded indebtedness in Ireland.

128.    In doing so, they are flagrantly abusing the protections they enjoy under the United States Bankruptcy Code and violating the duties imposed upon them by the Bankruptcy Code and the federal common law.

## Relief Requested

## Count I

### (Breach of Fiduciary Duty)

129.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 129 above as if fully set forth herein.

130.    The Foreign Representatives owe and owed McKillen fiduciary duties of care under the Bankruptcy Code and under common law to the extent they view him as an unsecured creditor of the liquidation estate, which they must since they avow that he was a shareholder of Anglo through the Maple 10 transaction (and, unrelatedly, he was a shareholder in any event).

131.    The Foreign Representatives breached the duties they owed to McKillen during the parties' negotiations to resolve all his indebtedness and obligations to IBRC by failing to

identify the First Facility Letter issued in connection with the Maple 10 loan as an alleged extant debt they intended to assert against him (which debt is denied).

132.    The Foreign Representatives breached the duties they owed to McKillen during the parties' negotiations to resolve all his indebtedness and obligations to IBRC by concealing their intent to pursue collection of debt against McKillen under the First Facility Letter.

133.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt illegally made by Anglo.

134.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt under the First Letter Facility, despite their knowledge that that debt instrument was expressly superseded by the Second Letter Facility.

135.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt under the First Letter Facility, despite their knowledge that the Second Letter Facility and subsequent events entirely eviscerated the subject debt, if it ever existed.

136.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt he does not owe.

137.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland to enforce an illegal debt.

138.    These breaches involve and include *ultra vires* acts by the Foreign Representatives.

139.    These breaches of duty were not conduct that a reasonable person standing in the shoes of the Foreign Representatives would have engaged in, and cannot be excused by the business judgment rule or other immunizing doctrine.

140.    As a result of the referenced breaches of duty, *inter alia*, the Foreign Representatives have foreseeably and proximately harmed and injured McKillen, Leonard, and Clarendon in their business, reputation, and commercially in the United States.

## Count II

## (Breach of Duty of Care)

141.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 140 above as if fully set forth herein.

142.    The Foreign Representatives owed McKillen duties of care under the Bankruptcy Code and under the common law in his capacity as a person in interest of the liquidation estate.

143.    The Foreign Representatives breached the duties they owed to McKillen during the parties' negotiations to resolve all his indebtedness and obligations to IBRC by failing to identify the First Facility Letter issued in connection with the Maple 10 loan as an alleged extant debt they intended to assert against him (which debt is denied).

144.    The Foreign Representatives breached the duties they owed to McKillen during the parties' negotiations to resolve all his indebtedness and obligations to IBRC by concealing their intent to pursue collection of debt against McKillen under the First Facility Letter.

145.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt illegally made by Anglo.

146.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt under the First Letter Facility,

despite their knowledge that that debt instrument was expressly superseded by the Second Letter Facility.

147.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt under the First Letter Facility, despite their knowledge that the Second Letter Facility and subsequent events entirely eviscerated the alleged debt.

148.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland in an attempt to collect a debt he does not owe.

149.    The Foreign Representatives breached the duties they owed to McKillen by initiating suit against him in Ireland to enforce an illegal debt.

150.    These breaches involve and include *ultra vires* acts by the Foreign Representatives.

151.    These breaches of duty were not conduct that a reasonable person standing in the shoes of the Foreign Representatives would have engaged in, and cannot be excused by the business judgment rule or other immunizing doctrine.

152.    As a result of the referenced breaches of duty, *inter alia*, the Foreign Representatives have foreseeably and proximately harmed and injured McKillen, Leonard, and Clarendon in their business, reputation, and commercially in the United States.

## **Count III**

### **(Fraud and Fraudulent Inducement in Pursuit of Debt under the First Facility Letter)**

153.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 152 above as if fully set forth herein.

154.    By virtue of his relationship of trust with bank representatives in the United States, as the financier of his US property interests, and as a commercial tenant in Boston that could negatively impact his business and the handling of his debt obligations, Anglo fraudulently and illegally induced McKillen to enter into the Maple 10 transaction with knowingly false representations of necessity, legality, and urgency.

155.    Anglo expected McKillen to rely in these material representations, and he did in fact reasonably rely on the bank's representations in entering into the Maple 10 transaction and related debt instruments.

156.    Anglo knew that McKillen was unaware that its representations with regard to the Maple 10 transaction were false.

157.    Moreover, McKillen felt compelled to accede to the bank's requests in light of the bank's ability, *inter alia*, to strangle his United States interests if he declined to participate -- a tacit, albeit not expressly stated, threat the bank used to its advantage in its dealings with McKillen.

158.    The Foreign Representatives now stand in the shoes of the debtor, IBRC, and its predecessor entity, Anglo.

159.    The Foreign Representatives, moreover, cannot disclaim that they owed and owe McKillen a fiduciary duty and additional duties of honesty and disclosure under the Bankruptcy Code and the common law since they must treat him as both an unsecured creditor of the liquidation estate and a party in interest; and had an obligation to exercise their power and authority as special liquidators in the IRBC's insolvency-related proceeding fairly and in good faith.

160.    Notwithstanding these duties, the Foreign Representatives have adopted and are perpetuating the fraud engaged in by Anglo personnel by pursuing collection of the illegal Maple 10 debt as against McKillen.

161.    Additionally, in their own capacity, during the parties' negotiations to resolve all of McKillen's indebtedness and obligations to IBRC, the Foreign Representatives knowingly concealed/did not disclose their views and plans with regard to the Maple 10 loan and the First Facility Letter, which issues were material to the Loan Sale Deed.

162.    In so doing, the Foreign Representatives knew McKillen would rely on their representations and silence, as the case may be; and McKillen did reasonably rely thereon to his detriment.

163.    As a result of the foregoing, Plaintiffs have suffered and will continue to suffer actual losses.

## Count IV

### (Negligent Misrepresentation or Equitable Fraud)

164.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 163 above as if fully set forth herein.

165.    As shown herein, and as mandated by the common law and the Bankruptcy Code in addition to their avowed position that McKillen was a shareholder, the Foreign Representatives owed a duty to McKillen to provide him with accurate information.

166.    As shown herein, the Foreign Representatives failed to provide McKillen with accurate information, but instead supplied him with false information and purposeful concealment.

167.     As shown herein, the Foreign Representatives failed to exercise reasonable care in communicating information to McKillen.

168.     McKillen, Leonard, and Clarendon suffered a pecuniary loss as a direct result of McKillen's justifiable reliance on the false information provided by the Foreign Representatives.

## Count V

### (Modification of the Recognition Order)

169.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 168 above as if fully set forth herein.

170.     By this application, Plaintiffs respectfully request that this Court modify the Recognition Order to the extent that it gives recognition to the Defendants as Foreign Representatives, and grant related relief.

171.     The circumstances of this case have changed substantially since the Recognition Order was granted and continuing to recognize the Foreign Representatives would be manifestly contrary to the public policy of the United States underlying Chapter 15, and therefore warrants modification of the Recognition Order pursuant to sections 1506 and 1517 of the Bankruptcy Code.

172.     Section 1506 permits the Court to refuse to take an action governed by Chapter 15 "if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.

173.     Section 1517(a) of the Code premises the requirements for the grant of recognition of a foreign proceeding and foreign representatives upon compliance with section 1506. 11 U.S.C. § 1517(a) ("Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if" enumerated requirements are met).

174.    The Court should be satisfied that a recognition order is not to be manifestly contrary to the public policy of the United States, and the recognition order can be reevaluated if the circumstances warranting the initial recognition have changed.

175.    Here, the considerations relevant to the initial grant of recognition now mandate modification of the recognition order, in that continued recognition of the Foreign Representatives would be manifestly contrary to the public policy of the United States and thus contrary to section 1506.

176.    Here, continued recognition of the Foreign Representatives would be manifestly contrary to public policy because their pursuit of McKillen for alleged indebtedness related to a loan illegally made by Anglo is in direct conflict with the express purpose of Chapter 15 set forth in section 1501(a) of the Bankruptcy Code.

177.    Continuing to recognize the status of the Foreign Representatives would effectively authorize the pursuit of debt obtained illegally and the enforcement illegal agreements while under the protection of this Court; would tacitly and explicitly sanction sharp practice by fiduciaries; would reward breach of fiduciary duties and the duties imposed by the Bankruptcy Code; would allow the Foreign Representatives to pursue a vendetta against McKillen; would turn a blind eye to and reward the admittedly criminal conduct of Anglo in its dealings with McKillen; would effectively reward overseas abuse of process by the Foreign Representatives in breach of Bankruptcy Rule 9011; and would give license to the Defendants to attempt to use the Recognition Order to shield them from accountability for the damage their overseas machinations and improper conduct are inflicting upon Plaintiffs here in the United States.

178.    For all of the reasons set forth above, continuing recognition of the Defendants as foreign representatives under would be manifestly contrary to the purpose of Chapter 15 and would violate United States public policy.

179.    Thus, Plaintiffs request that the recognition of Defendants as foreign representatives under the Recognition Order, including any protections they might seek or enjoy under the automatic stay implemented under section 1520(a) of the Bankruptcy Code, be terminated.

**WHEREFORE**, Plaintiffs hereby demand judgment against Defendants as follows:

A.    For breach of duties of care to McKillen, and for the resultant harm to Plaintiffs, a judgment for money damages in an amount to be determined, plus interest and costs thereon;

B.    For fraud and misrepresentation, and/or the perpetuation of prior fraud and misrepresentation, in violation of their duties of care to McKillen, a judgment for money damages and punitive damages in favor of Plaintiffs;

C.    For negligent misrepresentation or equitable fraud in violation of their duties of care, a judgment for money damages and punitive damages in favor of Plaintiffs;

D.    Modification of the Recognition Order entered in this case to terminate recognition of the Defendants as foreign representatives and related relief; and

E.    A judgment granting reasonable costs and disbursements and such other and further relief as the Court deems just and proper.

Dated:  July 13, 2018

**GIBBONS P.C.**

By: */s/ Natasha M. Songonuga*
Natasha M. Songonuga (DE Bar # 5391)
300 Delaware Avenue, Suite 1015
Wilmington, DE 19801-1671
Telephone: (302) 518-6300
Facsimile: (302) 429-6294
Email: nsongonuga@gibbonslaw.com

-and-

Jennifer A. Hradil (*pro hac vice* pending)
David N. Crapo (admitted *pro hac vice*)
One Gateway Center
Newark, NJ 07102-5310
Telephone:  (973) 596-4523
Facsimile:  (973) 639-6244
E-mail: jhradil@gibbonslaw.com
dcrapo@gibbonslaw.com

-and-

Anthony P. Callaghan (*pro hac vice* pending)
One Pennsylvania Plaza, 37th Floor
New York, NY  10119-3701
Telephone:  (212) 613-2000
Facsimile:  (212) 290-2018
E-mail: acallaghan@gibbonslaw.com

*Counsel for Movants, Paddy McKillen,*
*Anthony Leonard and Clarendon Properties*
*Limited*